Our final case for today is Grant v. Trustees of Indiana University. And I believe we will hear from Mr. Grant. Good morning, and may it please the Court. Your Honor, this case is simple. It's about revenge, it's about retaliation, and it's also about plain sight. After Mr. Grant put in an affirmative action complaint, and I should point out that Indiana University South Bend, we refer to it now as IUSB, affirmative action complaints are discrimination complaints. After Mr. Grant put in an affirmative action complaint, Mr. Guillaume took out Mr. Grant's supposed 1998 CV and said that Mr. Grant has misled the university, specifically claiming that Mr. Grant claimed to have been on the faculty of Boston State College, Howard University, California State. Mr. Grant, of course, simply pointed out, no, he worked on this campus for private contractors, and it's on his application that he did not work at these places as a faculty member. But for some reason, and we pretty much know the reason, he continued on with this. He brought Mr. Grant before the Faculty Misconduct Committee in 2009 with those charges. The Faculty Misconduct Committee, it's right there in the record, said that there's no reason to have a hearing, and that even if these things were true, it's not enough to lose your tenure, and it wasn't true. Mr. Guillaume waited six months and pushed it through to Una Mae Rett, saying that regardless of what the FMC says, I want him terminated anyways. I should point out that according to the Faculty Misconduct Committee's rules, if Mr. Guillaume had any issue with the Faculty Misconduct Committee, he had 10 days to present his issues. He did not. And you can see why, because there's no instances on the record that the Faculty Misconduct Committee did not go by the policies. There's no issue on the record that the Faculty Misconduct Committee did not take in all consideration. There's nothing on that. After it went to Una Mae Rett, the then-Chancellor, Una Mae Rett assigned the issue to Klink. Klink is a private investigator. The private investigator looked into these things and came up with the same facts that the Faculty Misconduct Committee had. Now, per IUSB policy, if you're going to use the Klink report, the Klink report has to go back to the Faculty Misconduct Committee. Only things that are presented to the Faculty Misconduct Committee can be used for termination. Mae Rett, the then-Chancellor, simply took the Klink report, even though it was the same as what the Faculty Misconduct Committee looked at, and said, based on this, you're terminated. Well, at IUSB, in order for a person to be terminated, they must go through the Promotion and Tenure Committee. Why? Because when a person is tenured, there's an issue of the bad act, which is done by the Faculty Misconduct Committee, and there's the issue of whether it's worthy of being fired for. She didn't put it through the Promotion and Tenure and Review Committee. She just simply sidestepped it. Her position was, I don't need to go through the Promotion and Tenure Committee, that I can simply fire you with a letter of dismissal. And that's what she did. Mr. Grant's argument is that he had a property interest in his position, and that property interest is written within the policies of Indiana University South Bend. Indiana University South Bend recognizes this when they state specifically, in order for a faculty member to be terminated, they must have a hearing. They must be found guilty. And based on that, it goes to the Promotion and Tenure Committee to determine if that person should be terminated. That did not happen in this case. Also problematic in this case is that Mr. Grant has always claimed that he was never an employee of these institutions, and it lists it on his application. So there's an issue of fact. If he did not put it on his application, then he should not be held accountable for their interpretation of his CV. And it should be pointed out that Mayreck and Mr. Guillaume are the only ones that had an issue with this. So let me just make two comments, Mr. Grant. One is that in cases like this, you know, our job isn't to review, per se, what the trustees of Indiana University did or whoever was the responsible person at IUSB. It's to ask whether any rational trier of fact could find that the reason they gave for their action was an illegal reason, was a discriminatory reason or not. And secondarily, I mean, one of the things you've emphasized is whether you've got enough process and opportunity to present your side, but you certainly presented your side on a lot of different occasions through this period. You gave lengthy, you know, 43-page response on April 25th, and you gave a 42-page response September 23rd. I mean, nobody was rushing into anything about this. It took quite a while for things to happen. So I think it's important to remember the limited scope of what we're able to do. Yes, Your Honor, and I want to make sure that we don't confuse the response with process. The issue here is that. So you agree, then, you've got plenty of process? No. Oh, okay. That's why we're here. I can't imagine how much more process. The idea here, Your Honor, is that. What process do you think you should have had that you didn't have? The process that's codified in IUSB documents. But that's not a federal issue. I mean, we don't. Federal due process isn't the same as whatever internal procedures an institution has. Yes, Your Honor. But it's a federal issue when you take away a person's property rights. Without some kind of due process. But we evaluate whether there was due process independently of whether there was perfect compliance with the institution's rules. In this case, the idea is that IUSB has set up processes that. No, I understand. Most universities have. That coincide with the constitutional issues. If IU simply does not follow those processes, then what's the recourse? So, for example. Well, state law is the short answer. Maybe there is some state right. I mean, IU says, of course, that their handbook is not a contract. And maybe if you want to save some of your comments to respond to what they have to say, this would be the time to do that. Thank you. I'm not sure how to pronounce this. Are you Mr. Lichty? How do you pronounce your last name? Lichty, Your Honor. Lichty. Okay. May it please the Court. Your Honor, this case is not about revenge. This is about a university protecting its prestigious reputation. It's about a university protecting the caliber of its faculty. It's about a prestigious university, a state institution at that, protecting the education of students with whom or that have entrusted their education with this university. Chief Judge Wood, I think you put your thumb right on this case in terms of two key questions that are presented. One, of course, is was there a legitimate reason for the termination decision? Absolutely, there was. And I want to be cognizant of this Court's opinion last month in Ortiz, but I thought Judge Pratt, in terms of the district court's opinion, particularly a well-reasoned opinion, I recognize there's references to direct and indirect language in there, but ultimately, the district court asked the fundamental question that Ortiz now asks us to answer. And that is, is there any evidence here that would indicate that there would be a different result, assuming that Mr. Grant was of a different race, but all things remain the same? And the answer to that is merely no. There is absolutely no evidence. Ortiz recognizes that all evidence is evidence, but in this case, there was absolutely no evidence. As an example, Judge Pratt, in her well-reasoned opinion, looked at the McDonnell-Douglas test, which Ortiz does not upset, and in doing so, noted that there was not only no evidence, but no argument on the similarly situated component of that test, which doesn't allow us to get past the prima facie case. I think more fundamentally in this case, in terms of the legitimate reason the university had, there were some terribly concerning, terribly upsetting questions and facts about Mr. Grant's credentials. So why did this all get started? Obviously, Mr. Grant is doing quite well teaching there, as the record seems to indicate, until these 2008 complaints come the school's way. And then the further they dig, the more they continue to dig, up until the time they hire the Klink firm, which gives its report, and I guess that's what's the real trigger for the final action. That's right, Your Honor. We don't have a great history in terms of the function of the search and review committee, but tenure is not a license to have misrepresented credentials. It's not a blessing of that conduct. And certainly the university was well within its prerogative to, as it identified issues with Mr. Grant's credentials, explore those to ensure that the caliber of its faculty was in line with its expectations. Mr. Lechte, I understood Mr. Grant to suggest that after the Klink report was received, the university procedures would have required that the matter be re-referred to the Promotions Committee. Wouldn't a deviation, if he is correct on that, wouldn't a deviation from the standard procedures of the university be some indication, some evidence of discrimination? I think that could be a factor that the court could consider, but there was no deviation in this case. How do we know that? Right. So if we look at the record, Your Honor, what we know from the university's policies is that there's a chain of command that begins with the Vice Chancellor of Academic Affairs, goes through the administrative officers, and ultimately can ultimately go to the president of the university. As that Indiana University policy dovetails with the IUSB policy, the issue is first presented along the way to the Faculty Misconduct Review Committee. That Faculty Misconduct Review Committee did consider the issue. They made a recommendation. It's not a binding determination. It is a recommendation. As Mr. Grant mentioned, Vice Chancellor Guillaume disagreed with that recommendation after some deliberation and proceeded on, consistent with the policy that Indiana University has established, to go then to the Chancellor. There is no requirement in the procedures that the Promotion and Tenure Review Committee also review this decision. Now that was the system. There is no requirement? There is no requirement. There was that requirement in the prior to 2001 version of the handbooks, but that then was revised. There's actually a provision, a bolded provision that precedes Article 11 in the IUSB handbook that says, if you're going to evaluate serious misconduct, that is to go to the Faculty Misconduct Review Committee. Ultimately then it goes to the Chancellor. Then the next step is, of course, the Faculty Board of Review. So you're telling us that once it's in the Chancellor's hands, it doesn't need to go back down again, so to speak, to this Faculty Committee? It does not. There's additional provisions actually in the handbook, Your Honor, that talks about this proceeding on with the Faculty Board of Review. In particular. Well, here the Faculty Board of Review eventually gets the case, but then Mr. Grant decides he's not going to follow through, right? That's correct. So he had the opportunity to be heard multiple times, as Your Honor mentioned, in writing several times. I think the district court counted eight times in total. There was exceptional due process, I think, given to Mr. Grant. Certainly he had the opportunity in addition to the FBR hearing, the Faculty Board of Review hearing. Let me ask you this. Why did IU fail to produce records showing that Grant's discrimination complaints were investigated? I don't believe that was the case, Your Honor. There was extensive discovery in this case. I don't remember the exact count, but we received approximately 600 discovery requests, I think, in approximation. We responded to those consistent with our obligations, and we provided those records related to the affirmative action complaints. And all of those issues, of course, were dealt with appropriately, I think, by the magistrate and the district court judge. On the Faculty Board of Review hearing, Mr. Grant not only had an opportunity for that, but I think he had an opportunity before his termination to pursue that. Chancellor Reck informed him, of course, that he had that right. Mr. Grant indicated, I think, within a day or two, that he intended to pursue that right. A couple weeks had passed. She again informed Mr. Grant that it would be wise, if you're going to pursue that course, to do so, given that in a few months your termination will become effective. Mr. Grant waited really until the end of that time before he pursued that, and ultimately, as Your Honors know, that trickled then into the following year. We're talking about the end of 2012, is that right? No, no, 2011, December 31, 2011. That's correct, Your Honor. So there was exceptional due process here provided, Your Honor, certainly consistent with Loudermill and this court's precedent on that subject. I don't believe there was any evidence whatsoever of a similarly situated comparator, certainly not evidence of pretext to upset the district court's sound decision on termination or retaliation. I think the state law claims speak for themselves. There is no evidence whatsoever of any false statement, and I think this court's treatment of the handbooks, including the Southern District of Indiana's treatment of that handbook, as a noncontract, would apply equally to this case. And for those reasons, Your Honor. Could I just, I think I saw this, the district court went ahead and resolved the state claims, didn't decline to exercise supplemental jurisdiction over them, right? It did not decline to exercise supplemental jurisdiction. So it did resolve them, yeah. I think at that time it was all close to the eve of a trial, and I think consistent with this court's precedent in the past, it would have been appropriate for the court to continue to exercise supplemental jurisdiction if the federal claims were nonetheless dismissed. Okay. For those reasons, we ask for the summary judgment to be affirmed, Your Honors. All right. Thank you very much. Anything further, Mr. Grant? The problem here, Your Honor, is that when Mr. Grant put in for the, made the affirmative action complaints, there's absolutely no evidence that they even looked at his complaints. They didn't conduct an investigation. They didn't talk to witnesses. They didn't do anything. So now he's here saying, well, we did do something. Well, show me. There's nothing here. As a matter of fact, Deidre Turner, who was the affirmative action officer, they asked her to keep the case on, one of the cases on the IUSB campus, excuse me, instead of IU's campus. Well, Mr. Grant never spoke to Deidre Turner. There's no evidence that she ever investigated anything. So these are, the courts have said that a failure to investigate may allow a jury to impose liability on an employee. If Mr. Grant puts in a discrimination complaint, and Indiana University simply ignores it, that's an issue for the federal courts. But shouldn't you have followed up on that? That happened a long time ago. And typically there's a two-year statute of limitations in Indiana for civil rights-based actions. No, Your Honor. It's all concurrent. He made the complaint before, I mean, concurrently with being terminated. There's been a series of complaints. But the original affirmative action complaints were 2008, weren't they? No. Mr. Grant has been doing affirmative action complaints since he got on campus against Mr. Guillaume. Right. Well, there was at least one in July of 2008. Yes. Because the issue was that there were student complaints because they were in the newspaper. But when Mr. Grant asked for the student complaints, because it was news to him, in the deposition they acknowledged, no, no students complain. It was a pretext. They just simply went to the newspaper to say it. And not only that, Mr. Williams said in the paper how Mr. Grant was sanctioned. Okay. I think you need to wrap up at this point. I'll give you kind of a final sentence here. Okay. The final sentence is, and this is the law and economics court, if we put in discrimination complaints, and the discrimination complaints are not investigated. They're simply ignored. Then that's an issue for the federal court to look at. If there's policies and procedures that take in property interests and they do not go with that, then that's the interest of the federal court. That's all we're saying. Okay. Well, thank you very much. We will take your case under advisement. Thanks to the other counsel. And the court will be in recess.